Jiiiige Marshall
delivered the^opinion of the Court.
In 1848, Mrs. Rebecca Kirby, a resident citizen of Kentucky, and the owner of a female slave, Maria, took Maria with her on a journey, or trip of pleasure, to the eastward, and during a delay of three or four days in Washington county, in the State of Pennsylvania a writ of habeas corpus was issued on the petition of a colored man named Brown, commanding that Maria, alleged to be illegally detained, etc., should be brought before the judge. And upon the return of the writ showing that Maria was claimed as a slave purchased in Kentucky,, she was discharged from custody and restraint, and declared to be a free woman, to go where she pleases without coercion or restraint from any one. But Maria returned to Kentucky with her mistress, and was here held as a slave until January, 1850, when she filed this bill claiming that she was free by virtue of the proceedings and judgment or award on the writ of habeas corpus in Pennsylvania.
*543 The defendant, Kirby, besides demurring to the bill, answered denying thealleged right to freedom admi.ting the proceeding on the habeas corpus, except that she neither made nor authorized any return in her name on the writ. She also denies that the writ was issued at the instance and with the consent of Maria, and states that all that occurred before the judge was, that Maria, on interrogation, said she would rather go back to Kentucky as defendant’s slave, than to remain in Pennsylvania. As to this, and all other material facts, the answer is supported by the only deposition in the cause. And it is to be observed that the order or judgment does not simply declare Maria to be free, but discharging her from restraint, declares her to be a free woman to go where she pleases, etc., as if conceding her right of choice between freedom and slavery. And indeed it would seem very strange if a slave temporarily present with her mistress in Pennsylvania, could, by the intervention of others against her own will be wrested from the possession of her mistress and forced by the law or its ministers to be free.
The bill makes no reference to any law or statute of Pennsylvania, but rests the claim to freedom merely on the fact that Maria was taken to Pennsylvania by Mrs. Kirby, and upon the proceedings on the writ of habeas corpus. It was agreed, however, upon the record in the Circuit Court, that the 10th section of the statute , of Pennsylvania for the abolition of slavery, passed in ■ 1780, and also a statute of 1847 repealing the exceptions contained in said 10th section should be considered as a part of the case. Neither of these statutes is actually copied into the record before us. Nor have we any other evidence of their contents than as stated in the arguments and briefs of counsel. From these we understand the 10th section of the act of 1780, as modified by that of 1847, to be as follows, viz:
“ No man or woman, of any nation or color, except the Negroes of Mulattoes, who shall be registered *544 as aforesaid, shall at any time hereafter be deemed, adjudged, or holden within the territories of this Commonwealth as slaves or servants for life, but as free men and free women.”
It was doubtless under the authority of this act, and in reference to it, that the writ of habeas corpus was issued, and tfiat María was discharged under it. And the question of her freedom has been argued on both sides; 1st, as it arises under the operation of the statute itself; and 2d, as it is affected by the proceedings and award or judgment on the writ of habeas corpus. It has not been made a question whether the statute of Pennsylvania should or should not have the same effect as if set out and relied on in the bill, and wre suppose it was intended that it should have the same effect.
Then the first question is, what effect by the law of Kentucky is this statute of Pennsylvania to have upon the condition and rights of a slave voluntarily taken by the owner through or into the State of Pennsylvania, and there casually remaining three or four days, or a few hours, or one minute, but acknoweldging servitude and the right of the owner during this commorancy, and returning to Kentucky as a slave? We put the question in this way because it has been argued that the statute operates instantaneously, and changes the condition of the slave just as soon as there is a voluntary entry by the owner with the slave within the territorial operation of the law ; and because while we can distinguish between a removal to Pennsylvania, or an entry upon her limits for the purpose of residence, and an entry for a merely transient or temporary purpose, we cannot, in this last case, distinguish between a com-morancy or delay of four days and one of four minutes. Nor indeed, if the statute is to have an instantaneous effect upon the condition of all persons coming within the limits of the State, do we perceive any ground for distinguishing between the casein which the owner voluntarily crosses the line of the State, and one ih which he crosses it accidently and ignoraullv. Or if *545 ignorance of the boundary of the State should hare the effect of repelling the operation of the statute, so should ignorance of the statute itself, which a foreigner is not presumed to know, have the same effect.
Though a State may have a right to declare the condition of all persons within her limits, the right only exists wMlst that per'son remain there She has not tile power of giving a condition or aiatufc i which will adhere to the perspn eveiy where—butupon his returii to the place of his dom toil, he will occupy his former position if a slave, that of a slave, ii hired as such before, and if sojourn in the other State was for a temporary-purpose only: Graham vs Stra-der, (7 B Mon. 635,) Collins vs America, (9 lb. 565. And the effect of a removal into a free State of a slavp who returns with or to his owner is to be determined by the Jaw of Kentucky, not by the bonds of the State, where the slave may hay# bepn,
The 10 section of the Statute of Pennsylvania, of 1780, is in sab. stance like the ordinance of 1787. “That there shall be no slavery or involuntary servitude within her territory,” but does not impart par. don to slaves temporarily with in their territory with their owner or their ■mailers consent.
*545 It may be admitted that Pennsylvania; except as restrained by the constitution of the United States, has a right to determine by her laws, what shall be the condition of all persons within her limits. But we do not admit that, as to strangers; this right exists any longer than while they are within her limits, oí that on the ,ground of a transient entry, or momentary sojourn, upon her territory for a temporary and lawful purpose; a new and permanent condition or status can by her laws be stampted upon strangers so as that it shall adhere to them and determine their condition on their re-turn to their own domicil. The doctrine of this Court, as heretofore declared, is that although by going into another State, even temporially or transiently, a citizen subjects himself in fact to her laws, while there, he does not thereby assume the condition which they declare belongs to all persons, or to those of his class, but that upon his return he will be regarded as if he had not been absent, or as having carried with him and brought back the same condition and rights which belonged to him before by the laws of his own States Graham vs Strader, (7 B. Monroe.) Collins vs. America, (9 B. Monroe.) This is the principle of the cases referred to as applicable to the condition of slaves as well as to the condition and rights of the master. And the Court has further maintained the principle to which Wé adhere, that the effect and operation of the foreign law upon the rights and the condition of his slave temporarily within its jurisdiction by the consent or act of his master, with no intention to change their relative condition, is to fee determined in a contest between them in our own Courts by our own laws and not by the foreign law.
It remains, then, upon this part of the subject only to say, that the tenth section of the Pennsylvania stat *546 ute of 1780, stripped of its exceptions, is neither prohibitory nor vindicatory, nor even declaratory of the consequence of any particular act or fact; but is merely declaratory of the general principie, that no person shall be adjudged or holden within that Commonwealth as a slave, but as free, that is all shall be held to be free. It does not differ in principle or substance from the declaration in the ordinance of 1787, “ that there shall be neither slavery nor involuntary servitude in the said territory,” which, in the cases referred to, was decided not to impart freedom to slaves temporarily within the territory, with their owners or by their consent. And it still more nearly resembles the first section of our own statute of 1798, (Statute Law 1471,) which enacts “ that no persons shall henceforth be slaves within this Commonwealth, except such as were so on the seventeenth day of October, in the year one thonsand seven hundred and eighty-five, and the descendents of the females of them.” To say that persons of a certain description shall not he slaves, is fully equivalent to saying that they shall be free. And our statute is even more peremptory, and apparently more direct in its operation than that of Pennsylvania, since our statute declares positively that the persons not coming within the exception shall not be slaves within this Commonwealth, while the other only declares that no persons not registered, etc., shall be deemed adjudged or holden as slaves &c.
And yet, while it cannot be doubted that many persons who our statute declares shall not be slaves within this Commonwealth, have been brought into it as slaves, it has never been imagined that the statute, by its own force, emancipated them while temporally here, and much less that it made them free on their return to the domocils of their owners -from which they were brought and to which they returned, or were taken back as slaves. Nor do we suppose that if a slave thus brought temporially within the State were to sue his owner for freedom on the. ground, that by *547 this statute he could not be held in slavery in Kentucky, any Court in this State would construe the statute as giving the right to freedom, or taking from the owner his right to the slave because he was here with him for a transient or temporary purpose. The construction would doubtless be, that the statute, though absolute aud general in its terms, was intended to regulate the rights and acts of the citizens and residents, and not of transient visitors.
A statute of any non ilateholdinf Stan declaring that any «lave bro gilt into thatr. State, by his owner, though taken there for a temporary purpose only, should be instantly free, will not be enforced in Kentupky.
*547 It is true, the Courts of Pennsylvania may have construed their statute differently. The Judge who-acted upon this habeas corpus certainly did so ; and it may be that the legislature of 1847, in repealing the exceptions contained in the original act, intended that the general declaration which remains should operate ipso facto and at once, to free every slave brought, within the State, without regard to the occasion of his being brought, or the duration of his stay. But such a construction by the Courts, or such an intention on the part of the legislature does not seem to refer itself to any view of internal policy, but results apparently from a disregard or denial of rights of property established by our laws, and which, on principles of comity, should be at least passively respected in other States, so far as •their exercise in those States would not disturb the peace and order of society, or violate its internal policy; it would, in effect, be yielding our own law to the foreign law, and giving to the foreign law an extra territorial operation which is denied to our own laws, and that, too, in a point involving essentially the interests of our own citizens, and the institutions of the ■State if we should allow to the law in question the instantaneous, absolute, and permanent effect contended for, on the ground either that the legislature or the Courts of Pennsylvania had declared that it should, so operate.
If any State were to enact that any slave brought within its limits by the authority of the owner, and permitted by him to remain there six months, or three, *548 or even one, should be free, there might be some reason for saying that such a law should operate permanently, even upon the rights of strangers, because they would have an opportunity of knowing its provisions and avoiding its consequences. Bnt a statute declariug that any slave so brought into the State should be instantly and absolutely free, would except, on the ground that there could be no rightful slavery, not only be harsh and inhospitable, but would be unreasonable and unjust as to strangers who, though ignorant of its .terms would, while within the State, be subjected to the consequences of its infraction, without the possibility of avoiding them. We do not admit that these consequences, though expressly declared should be recognized and enforced by any other State against its own citizens who may ignorantly have incurred them. And, therefore, if we were bound to concede that the 10th section of the Pennsylvania act of 1780 was equivalent to an express declaration that every slave brought into that State should immediately be free, and although it would be certain that so long as the slave should remain in that State he would not be subject to the coercive authority of his owner, we still should not admit that the slave,, voluntarily continuing his subjection and returning with his owner, or brought back from .their temporary absence, could, under the laws of this Stafe, successfully assert a right to. freedom, because the statute of another State declared that any slave carried within its limits should be immediately free. On the contrary, we are of opinion that when after a temporary absence they are found here, at the place of their domicil, sustaining the same apparent .relation of master and slave as before, qur law will consider that relation as still legally subsisting, though they may have been in a S.tate where it was prohibited or not recognized, unless it is shown, or may be inferred that there was an intention to emancipate, or to submit to the emancipation declared by the statute of such State,
A slave taken to Pennsylvania by bis owner, and t hereupon habeas corpus de‘ cline^Lto be lree witl'i liberty to go where she pleased, came back to Kentucky, with her owner. Held that the decision of the judge in Penn sylvania, was ineffectual Lo show any right to freedom in a suit lor tha purpose brought m Kentucky, by the slave especially as she did not ask the suit in Pennsylvania.
What effect then is to be given to the proceedings on the writ of habeas corpus? We say it is entitled to none, and certainly to no conclusive effect upon the question whether Maria is or is not a slave by our laws. The only question presented by the petition and by the writ, was, whether Maria was illegally held in restraint by Mrs. Kirby or by Boyd, who was travelling with her. The response claimed that she was held by purchase in Kentucky as a slave for life, and thus referred the respondents title to the laws of Kentucky. As the response was not contradicted by any evidence, but was sustained by the admissions of Maria herself, the Judge, if he had considered the question whether she was a slave by the laws of Kentucky as decisive, or at all material in the case, must have assumed the affirmative. And if he decided this question at all, he decided it in that way, as is evident from his interrogatory to Maria. But it is manifest that he disregarded that question, and that he decided as to the illegality of the restraint complained of, solely upon the laws of Pennsylvania, of which none are relied on but the statute already referred to; from which it appears that in that State slavery is not recognized, and that all persons are there to be adjudged and holden as free. Then all that the Judge decided and all that the record of the proceeding conclusively proves, is, that Maria and Mrs. Kirby were in Pennsylvania, and before the Judge on the writ, that he considering the restraint upon Maria to he illegal according to the laws of that State, discharged her from it, and declared either that she was absolutely free, which would seem to have exceeded the limits and object of the proceeding, or that she was in that State free to go where she pleased, without coersion. But Maria did not ask for nor accept the benefit of this discharge, nor remain in Pennsylvania where it or the laws on which it was founded might have availed her, but remained in the custody and control of her mistress, and returned with her to Kentucky as her slave. And although it were conce- *550 dec! that the Judge decided right, according to the law of Pennsylvania, which disregards the law of Kentucky, and that by that law and the decision under it, Maria might have gone at large in Pennsylvania as a free woman; yet as she is here and appeals to our tribunals for the assertion of her freedom, the question still is, whether upon the facts appearing, she is free by the laws of this State. And we do not perceive how or why the conclusive proof by a record of the fact that she was in Pennsylvania with her mistress as a slave, and that by the law of that State the restraint was illegal, and she was entitled to go atlargeasa free woman, can have any other influence upon that question than the same facts would have if admitted or proved by oral evidence, and by the production of a statute accordant with the construction which the Judge seems to have placed upon that of 1780. And as such a statute would not, in our opinion operate of itself to make Maria free according to our laws, so neither can the proceedings upon the habeas corpus have that eilect, and especially when the writ was not sued out at her instance, and she in effect refused and disclaimed the benefit of it.
A decision again3t the appli cant upon one suit of habeas corpus, is no bar to another suit.
But in truth, the record and the proceedings which it states, are conclusive as to nothing except that such proceedings were had. If the decision had been against Maria, we assume that it certainly would not have been conclusive against her in Pennsylvania, but she might have obtained other writs, time after time, until she found a Judge who would decide the law in her favor. It would be strange then if it were conclusive against Mrs. Kirby whose rights were in fact not investigated nor decided, except to the extent that by the laws of Pennsylvania, her restraint of Maria was illegal. The decision is not conclusive here on another important principle, and that is, that Mrs. Kirby had not the benefit of those laws under which her right to Maria'was acquired and-sustained, and therefore in the trial in Pennsylvania, she had not the same *551 rights of trial to which she is entitled here, and from which, Maria could have precluded her, only by remaining in Pennsylvania, or by not coming to Iven-tucky. Besides, the parties are not the same. There was no regular litigation between Mrs. Kirby and Maria, and therefore no final determination of their respective rights. In fine there was nothing decided by the Judge, but that the slave became free by being brought into that State, and as the question is now to be decided by our laws, we say that according to our laws, the transitory ingress of Mrs. Kirby and her slave into the State of Pennsylvania did not make the slave absolutely free, notwithstanding the statute and the decision under it.
Kinkead Sf Breckinridge for appellant; Pindell, Shey, and Beck for appellee.
Wherefore the decree dismissing the bill is affirmed.